IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BOBBY LEE HINES | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | |
| | § | NO. 3-06-CV-0320-G |
| RICK THALER, Director | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division | § | |
| | § | |
| Respondent. | § | |

**FINDINGS AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Bobby Lee Hines, a Texas death row inmate who claims to be mentally retarded, has filed a successive application for writ of habeas corpus challenging his impending execution under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). For the reasons stated herein, the application should be denied.

I.

In 1992, a Dallas County jury convicted petitioner of capital murder and sentenced him to death. His conviction and sentence were affirmed on direct appeal and upheld on state and federal habeas review. *Hines v. State*, No. 71,442 (Tex. Crim. App. May 10, 1995); *Ex parte Hines*, No. WR-40,347-01 (Tex. Crim. App. Feb. 24, 1999); *Hines v. Cockrell*, No. 3-99-CV-0575-G, 2002 WL 108301 (N.D. Tex. Jan. 22, 2002), *aff'd*, 57 Fed.Appx. 210, 2002 WL 31956173 (5th. Cir. Dec. 31, 2002), *cert. denied*, 124 S.Ct. 51 (2003). Just eight days before his scheduled execution, petitioner filed a second application for state post-conviction relief challenging his death sentence under *Atkins*. The Texas Court of Criminal Appeals granted the stay, but ultimately denied post-conviction relief.

*Ex parte Hines*, No. WR-40,347-02, 2005 WL 3119030 (Tex. Crim. App. Nov. 23, 2005). Petitioner

then sought and obtained leave from the Fifth Circuit to file this successive writ in federal court. *See*

*In re Hines*, No. 05-11342 (5th Cir. Feb. 2, 2006). After conducting a "thorough review" of the writ,

the court determines that petitioner has satisfied the requirements for filing a second or successive

application for writ of habeas corpus. *See In re Morris*, 328 F.3d 739, 741 (5th Cir. 2003), *citing*

*Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001) (district court is a "second gate"

through which petitioner must pass before a successive federal writ is considered on the merits).

II.

In a single ground for relief, petitioner contends that he cannot be executed because he is

mentally retarded.

A.

The Eighth Amendment's prohibition of cruel and unusual punishments, as interpreted by the

Supreme Court in *Atkins*, bars the execution of mentally retarded offenders. *See Atkins*, 122 S.Ct.

at 2252. Recognizing that "[n]ot all people who claim to be mentally retarded will be so impaired

as to fall within the range of mentally retarded offenders about whom there is a national

consensus[,]" *id.* at 2250, the Court left to the States "the task of developing appropriate ways to

enforce the constitutional restriction upon [their] execution of sentences." *Id., quoting Ford v.*

*Wainwright*, 477 U.S. 399, 416-17, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986). Texas courts use

the definitions set out by the American Association on Mental Retardation ("AAMR") in evaluating

claims of mental retardation. *See Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). Under

the AAMR definition, mental retardation is a disability characterized by: (1) "significantly

subaverage" general intellectual functioning, defined as an I.Q. of about 70 or below, (2)

accompanied by "related" limitations in adaptive functioning, (3) the onset of which occurs prior to

the age of 18. *Id.* at 7; *see also Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008).[1] To prevail

on his *Atkins* claim, petitioner must prove all three elements by a preponderance of the evidence.

*See Briseno*, 135 S.W.3d at 12; *Lewis*, 541 F.3d at 283.

Where, as here, a state court has already rejected an *Atkins* claim, a federal court may grant

habeas relief only if the state court adjudication "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceedings." *Clark v. Quarterman*, 457

F.3d 441, 444 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1373 (2007), *quoting* 28 U.S.C. § 2254(d)(2)

(holding that whether a petitioner suffers from significantly subaverage intellectual functioning "is

a question of fact, and not a mixed question of law and fact"). Factual determinations made by the

state court are presumed to be correct and are unreasonable only where the petitioner "rebut[s] the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Hall*

*v. Quarterman*, No. 4-06-CV-0436-A, ___ F.Supp.2d ___, 2009 WL 612559 at *3 (N.D. Tex. Mar.

9, 2009), *COA denied*, No. 09-70015, 2010 WL 607253 (5th Cir. Feb. 22, 2010).

### B.

The court first considers whether petitioner's general intellectual functioning is "significantly

subaverage." In resolving this prong of the *Briseno* test against petitioner, the state habeas court

relied on: (1) expert reports; (2) the affidavits of family members, former teachers, and counselors;

and (3) records from Child Protective Services ("CPS"), the Paris Independent School District

("PISD"), and the Texas Youth Commission ("TYC"). Of particular significance were the results

of the Wechsler Intelligence Scale for Children-Revised ("WISC-R"), individually administered to

petitioner when he was 13 years old, which resulted in a full-scale I.Q. score of 96, a verbal I.Q.

---

[1] A similar definition is contained in the Texas Health and Safety Code, which defines mental retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE ANN. § 591.003(13) (Vernon 2003); *see also Briseno*, 135 S.W.3d at 7.

score of 82, and a performance I.Q. score of 112. *See Ex parte Hines*, WR-40,347-02, Tr. at 442,

¶¶ 59-60. While the results of intelligence tests, standing alone, do not necessarily prove or disprove

mental retardation, petitioner's scores suggest that his general intellectual functioning is not

"significantly subaverage." *See Briseno*, 135 S.W.3d at 7 n.24, *citing* American Psychiatric

Association Diagnostic and Statistical Manual of Mental Disorders at 39 (4th rev. ed. 2000)

("DSM-IV") ("significantly subaverage intellectual functioning" is defined as an I.Q. of about 70 or

below, approximately two standard deviations below the mean). The state court discounted the

opinions of Dr. Wesley E. Profit, who speculated that the WISC-R may have been improperly

administered or that petitioner's score might be artificially inflated, *see Ex parte Hines*, WR-40,347-

02, Tr. at 443, ¶ 64, and Dr. Gilda Kessner, who concluded that petitioner was mentally retarded

based on a full-scale I.Q. score of 69 on a recent Weschler Adult Intelligence Scale ("WAIS-III")

test. *See id.*, Tr. at 438-42, ¶¶ 38-52, 57. The court found that Dr. Profit's suppositions were wholly

unsubstantiated and that petitioner had "strong motivation" to perform poorly on the WAIS-III,

which was administered solely to gather evidentiary support for his mental retardation claim. *See

id.*, Tr. at 439, ¶ 44 & 443, ¶ 65. Even if the WAIS-III results were valid, the court noted that a full-

scale score of 69 meant that petitioner's actual I.Q. could be as high as 74, which is above the mild

retardation range, and that petitioner took the test when he was 31 years of age, which provides no

evidence of intellectual functioning before the age of 18. *See id.*, Tr. at 439-40, ¶¶ 43, 52. The state

court also discounted the results of two Otis-Lennon Mental Ability ("Otis-Lennon") tests, which

were administered by PISD counselors when petitioner was in grade school and yielded full-scale

I.Q. scores of 68 and 73, respectively, because the Otis-Lennon test "is a brief, group-administered,

verbal IQ test" and "not a tool for diagnosing retardation." *See id.*, Tr. at 434, ¶ 24.

Records from CPS, PISD, and TYC were also cited by the state habeas court in support of its conclusion that petitioner did not have "significantly subaverage" intellectual functioning. Although petitioner received special education services, the state court found no evidence in PISD records that petitioner was ever identified as mentally retarded. *See id.*, Tr. at 456-57, ¶ 119. Similarly, the state court found nothing in CPS or TYC records to suggest that petitioner was considered or treated as mentally retarded during his developmental years. *See id.*, Tr. at 459, ¶ 137 & 464, ¶¶ 159-60. Instead, petitioner was described by state psychologists and counselors as having only a "learning problem." *See id.*, Tr. at 459, ¶ 135 & 461, ¶ 143. The court specifically rejected the affidavit testimony of Karol Asay, a PISD teacher who characterized petitioner as "a significantly handicapped child," *see id.*, Tr. at 456, ¶ 123, and Rachel Braswell, a PISD counselor who said that petitioner was identified as mentally retarded, *see id.*, Tr. at 457, ¶ 125, finding that "their qualifications and reliability as witnesses on this issue are questionable." *See id.*, Tr. at 456, ¶ 120. The state habeas court also noted that petitioner's grades while enrolled in classes at TYC ranged from 85 to 91, *see id.*, Tr. at 461, ¶ 144, and that he earned a GED certificate when he was 17 years old. *See id.*, Tr. at 461, ¶ 146. While petitioner claimed that he passed the GED test only with assistance, the court found no evidence, other than the unsubstantiated affidavit testimony of Dr. Kessner, to support such an assertion. *See id.*, Tr. at 462, ¶ 150. In view of all this evidence, the state court concluded that petitioner failed to prove that his intellect is "significantly subaverage," or that any purported deficiency commenced prior to the age of 18. *See id.*, Tr. at 481, ¶ 246.

Petitioner has failed to rebut this finding by clear and convincing evidence. At an evidentiary hearing on his federal writ,[2] petitioner introduced the results of two additional intelligence tests

---

[2] The magistrate judge held a two-day evidentiary hearing on petitioner's *Atkins* claim to explore conflicting expert opinions and fully develop the record on the ultimate issue of mental retardation. *See Hines v. Quarterman*, ___ F.Supp.2d ___, 2009 WL 186192 at *2 (N.D. Tex. Jan. 22, 2009).

administered in April 2009--an updated version of the Weschler Adult Intelligence Scale ("WAIS-IV") test, which resulted in a full-scale I.Q. score of 70, and the Reynolds Intellectual Assessment System ("Reynolds"), which yielded a full-scale I.Q. score of 71. (*See* Evid. Hrg. Tr-I at 79-80, 83). Although these scores are consistent with a diagnosis of mental retardation, respondent's expert, Dr. J. Randall Price, offered credible testimony that the recent test scores underestimate petitioner's true level of intellectual functioning. (*See* Evid. Hrg. Tr-II at 70). According to Dr. Price:

> First, [petitioner] had previously scored considerably higher on IQ tests at the age of 13, at the age of 16, at the age of 19. Most strongly I would put the weight on at the age of 13 and the WISC-R. In my testing I administered three different tests of effort, at the beginning of the evaluation, in the middle of the evaluation, and towards the end of the evaluation. On two of those three they indicated a lack of full effort, and so my conclusion is that there was a variable amount of effort that was expended on those tests, which supports the conclusion that it's underestimation.

(*Id.* at 70-71). Dr. Price further opined that the WAIS-IV and Reynolds test results are unreliable because petitioner had a particular incentive to manipulate his performance on the tests to avoid the death penalty. (*Id.* at 74-75). Petitioner's expert, Dr. Kessner, countered that the consistency of the WAIS-III, WAIS-IV, and Reynolds scores made it highly unlikely that petitioner was purposely underperforming and that the probability of such consistency in test scores is "zero" and "equivalent to winning the Lotto." (*See* Evid. Hrg. Tr-I at 82). However, Dr. Kessner offered no empirical data or other evidence to support her opinion. Dr. Kessner also ignored evidence that petitioner may have received information about the WAIS-IV from his wife. (*See* Evid Hrg. Tr-II at 74-75). Whatever probative value the results of the recently administered WAIS-IV and Reynolds tests may have, they do not constitute clear and convincing evidence that petitioner's general intellectual functioning is "significantly subaverage."

Even if the results of the WAIS-IV and Reynolds tests are valid and reliable, they provide no evidence of petitioner's general intellectual functioning before the age of 18. The only reliable intelligence test administered to petitioner during his developmental years was the WISC-R, which resulted in a full-scale I.Q. score of 96. Dr. Kessner and the other experts who testified at the evidentiary hearing acknowledged that petitioner's scores on the two Otis-Lennon tests are not reliable indicators of mental retardation because they are "not comprehensive assessments of someone's intellectual functioning." (*See id.* at 44, 67; Evid. Hrg. Tr-I at 63-64).

Focusing on the WISC-R, Dr. Kessner expressed misgivings that the test may not have been administered correctly and raised questions concerning the qualifications, credentialing, and workload of the test-giver. (*See* Evid. Hrg. Tr-I at 66-67, 69-71, 102-07). Not only has petitioner failed to adduce any evidence of actual defects in the administration of this test, but Dr. Kessner's investigation into the circumstances of the WISC-R is itself suspect. Dr. Kessner never spoke with Dick Clark, the psychologist who certified the test results. (*See id.* at 67, 107, 116). Initially, Dr. Kessner said that she could not locate Clark. (*See id.* at 107, 116). Later in the hearing, Dr. Kessner testified that she was unable to reach Clark at the number provided to her. (*See* Evid. Hrg. Tr-II at 13-14). However, evidence offered by respondent shows that Clark readily spoke to petitioner's investigator and provided his address and phone number. Notes from that interview indicate that Clark was "not particularly helpful," did not budge on the suggestion of problems with "the 'dreaded' test," and was "very firm in his belief that whatever he had written in that report was how Bobby had tested[.]" (*See* Resp. Exh. 37 at 17-18). The court therefore rejects Dr. Kessner's opinions regarding the validity of the WISC-R.

The results of the WISC-R are also consistent with petitioner's performance in school and with the acquisition of a GED at the age of 17. At the evidentiary hearing, Dr. Richard Hughes, a

licensed psychologist, testified that petitioner's school records showed he suffered from a learning disability and an emotional disturbance. (*See* Evid. Hrg. Tr-II at 45, 48). Nowhere in the records was petitioner ever identified as mentally retarded. (*Id.* at 50). To the contrary, Dr. Hughes said that petitioner's school records demonstrate a pattern of functioning "wholly inconsistent" with the conclusion that he was considered mentally retarded. (*See id.* at 43). Karol Asay, petitioner's former teacher, testified that she remembered being told that petitioner qualified for special education services as both mentally retarded and learning disabled. (*See id.* at 6). However, Asay could not recall who provided that information. (*Id.*). Indeed, Asay had very little to offer in terms of relevant details regarding petitioner's retardation claim. When asked what she remembered about petitioner, Asay responded:

> I don't remember at all that he was a behavior problem in class. Because teachers do tend to remember the children who -- who were. I don't remember either that he was a high achiever in my class, you know, working on his functional level and really achieving, moving ahead well. Nor do I remember that he didn't achieve at all. Sorry, that's the best I can do.

(*Id.* at 6-7). Asay went on to say that petitioner "did not function as a seriously retarded child." (*Id.* at 7). Certainly this testimony does not rebut the presumption of correctness attached to the state court findings on the issue of mental retardation.

In sum, the results of the WISC-R administered when petitioner was 13 years old, his grades while enrolled in classes at TYC, his acquisition of a GED at age 17, and the information contained in his CPS, TYC, and PISD records all support the state court's finding that petitioner's general intellectual functioning was not "significantly subaverage" during the developmental period. Because petitioner has failed to rebut that finding by clear and convincing evidence, the court should reject his *Atkins* claim.

C.

Nor has petitioner satisfied the second prong of the *Briseno* test--that he has "related"
limitations in adaptive functioning the onset of which occurred prior to the age of 18 years. The
DSM-IV characterizes adaptive functioning as "how effectively individuals cope with common life
demands and how well they meet the standards of personal independence expected of someone in
their particular age group, sociocultural background, and community setting." DSM-IV at 42; *see
also Simpson v. Quarterman*, 593 F.Supp.2d 922, 929 (E.D. Tex.), *appeal dism'd*, 341 Fed.Appx.
68, 2009 WL 2462248 (5th Cir. Aug. 12, 2009), *cert. denied*, 130 S.Ct. 663 (2009). The diagnostic
criteria for mental retardation require limitations in two or more of the following areas of adaptive
functioning: (1) communication; (2) self-care; (3) home living; (4) social skills; (5) use of
community resources; (6) self-direction; (7) health and safety; (8) functional academics; (9) leisure;
and (10) work. *See Atkins*, 122 S.Ct. at 2245 n.3, *quoting* Mental Retardation: Definition,
Classification, and Systems of Supports at 5 (9th ed. 1992).

On state collateral review, three experts offered opinions on the issue of whether petitioner
has corresponding limitations in adaptive functioning. Two experts, Dr. Profit and Dr. Kessner, said
that petitioner "possesses sufficient deficits in his adaptive skills to warrant a diagnosis of mental
retardation." *Ex parte Hines*, WR-40,347-02, Tr. at 450, ¶ 91. Dr. Price opined that petitioner's
adaptive behaviors "are inconsistent with those of a retarded person." *Id.*, Tr. at 450, ¶ 92. The state
court gave greater weight to Dr. Price's "personal and more thorough evaluation" of petitioner and
his records. *See id.*, Tr. at 452, ¶ 101. The court also considered petitioner's adaptive behavior in
light of the *Briseno* factors as indicative of mental retardation.[3] *See id.*, Tr. at 452-80, ¶¶ 103-

---

[3] In *Briseno*, the Texas Court of Criminal Appeals identified seven "evidentiary factors which factfinders in
the criminal trial context might [ ] focus upon in weighing evidence as indicative of mental retardation or of a personality
disorder." *Briseno*, 135 S.W.3d at 8. These factors are:

245.  Specifically, the state habeas court rejected statements from family members and co-workers that petitioner was a "slow learner, slow to develop, gullible, and a concrete thinker," finding that their testimony was in conflict with the evidence at petitioner's original trial.  *See id.*, Tr. at 453-55, ¶¶ 106-112.  The court noted that, before petitioner was sentenced to death, none of these witnesses said he was mentally retarded.  *See id.*, Tr. at 454, ¶ 107.  The court also cited instances where petitioner devised and implemented plans throughout his life.  *See id.*, Tr. at 464, ¶ 163.  As a child, petitioner and his sister organized their escape from an abusive father, attempted to call the Child Abuse Hotline, and reported the abuse to school authorities.  *See id.*, Tr. at 464-65, ¶ 164.  The state court found that petitioner's response to external stimuli was not only rational and appropriate, but also indicative of a "keen survival instinct."  *Id.*, Tr. at 470, ¶¶ 191, 193.  Another time petitioner absconded from probation and remained at large for several days.  *See id.*, Tr. at 465, ¶ 167.  Regarding his ability to respond coherently, rationally, and on point to oral and written questions,

---

1.  Did those who knew the person best during the developmental stage--his family, friends, teachers, employers, authorities--think he was mentally retarded at that time, and, if so, act in accordance with that determination?

2.  Has the person formulated plans and carried them through or is his conduct impulsive?

3.  Does his conduct show leadership or does it show that he is led around by others?

4.  Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

5.  Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

6.  Can the person hide facts or lie effectively in his own or others' interests?

7.  Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8-9.

the court found that petitioner has "impressive" communication skills, particularly considering his

purported limitations. *See id.*, Tr. at 471, ¶ 201. Among other things, the court observed that

petitioner consistently provided responsive, clear, and cogent information and testimony to

authorities and was able to obtain a driver's license after taking and passing a written test. *See id.*,

Tr. at 472, ¶¶ 203-204 & 473, ¶ 207. The court also found that petitioner is an "inveterate and

accomplished liar," would deny criminal involvement and hide to avoid capture, and could conceal

facts to promote his own interests. *Id.*, Tr. at 475, ¶¶ 218-30. With respect to the brutal murder for

which petitioner received the death penalty, the court found:

> [A]pplicant committed the crime in the early morning hours, when his
> victim was sleeping and, thus, more vulnerable. He obtained access
> to her apartment by using the passkey belonging to his roommate,
> Jimmy Knight, thus [ ] obviating the need for a noisy, forceful entry
> that would have alerted [the victim] or others sooner. Applicant
> brought one of the murder weapons--the ice pick--with him, evincing
> a lethal purpose before he even entered the apartment. [The victim]
> fought applicant with force and determination, creating a loud
> disturbance, but applicant used the resources at hand to silence and
> subdue her, ripping a cord from her stereo speaker and strangling her.
> When the police responded to neighbors' reports of the disturbance,
> applicant did not flee in a panic. While the officers attempted to
> determine from which apartment the disturbance had originated,
> applicant patiently waited inside [the victim's] apartment, dressed and
> positioned her body, and selected various items to steal. Then, when
> the confounded officers left, applicant slipped back into his apartment
> next door undetected, taking the handle of the ice pick with him.
>
> [I]n the hours immediately afterward, applicant took steps to avoid
> discovery, dressing to hide the injuries he suffered to his neck during
> the struggle with [the victim] and feigning surprise at the discovery
> of her body.
>
> [W]hen confronted with his act, applicant resolutely denied any
> involvement.
>
> [A]lthough ultimately unable to avoid detection, capture, and
> conviction, applicant's conduct showed that he contemplated,

designed, and improvised the attack on [the victim] with a degree of
skill absent in those of lesser intellect.

Tr. at 477-78, ¶¶ 233-236.   The state court ultimately concluded that petitioner "has no

corresponding limitations in adaptive functioning" and, therefore, is not mentally retarded.   *See id.*,

Tr. at 481, ¶ 248.

No new evidence regarding petitioner's adaptive functioning was presented to this court at

the evidentiary hearing on his federal writ.   Instead, Dr. Kessner and Dr. Price expressed the same

opinions they offered to the state habeas court--Dr. Kessner said that petitioner has deficits in six of

the 10 areas of adaptive skills, (*see* Evid. Hrg. Tr-I at 174-82), while Dr. Price opined that petitioner

does not have any significant limitations in adaptive behavior.   (*See* Evid. Hrg. Tr-II at 84).   Like the

state habeas court, this court finds the testimony of Dr. Price more credible.   At the hearing, Dr.

Kessner appeared unfamiliar with the relevant areas of adaptive functioning and struggled to

articulate a clear opinion as to each area. (*See* Evid. Hrg. Tr-I at 117-22).   Only with prompting from

the court was Dr. Kessner able to identify home living, social and interpersonal skills, use of

community resources, self-direction, functional academic skills, and work as the areas of adaptive

functioning in which petitioner had significant limitations. (*Id.* at 181-82).   However, Dr. Kessner

was unable provide meaningful evidence in support of her conclusions and failed to address other

evidence refuting findings of significant limitations.

By contrast, Dr. Price provided clear and credible testimony that petitioner does not have any

significant limitations in his adaptive behavior.   (*See* Evid. Hrg. Tr-II at 84-87).   Dr. Price

acknowledged contrary evidence and explained how it did not undermine his ultimate conclusion.

In particular, Dr. Price noted that there is some evidence, including low grades in school and low

scores on standardized academic tests, that indicates petitioner has a deficit in the area of functional

academics. (*See id.* at 84). However, the evidence taken as a whole demonstrates that this deficit is most likely attributable to petitioner's recognized learning disability rather than to mental retardation. Dr. Price also noted evidence of a limitation in the area of work, but concluded that the brief time during which petitioner was not incarcerated and eligible for employment precluded a finding of a significant limitation. (*See id.* at 85). Finally, Dr. Price presumed that petitioner does not have a significant limitation in adaptive functioning, unless the evidence showed otherwise. (*Id.* at 85-86). That presumption accurately reflects the burden of proof in this case.

Petitioner has failed to adduce any evidence, much less clear and convincing evidence, that would shed new light on the *Briseno* factors. Consequently, there is no basis for disturbing the state court's determination that petitioner has no corresponding limitations in adaptive functioning or that any purported deficiency commenced during the developmental period.

## **RECOMMENDATION**

Petitioner's successive application for writ of habeas corpus should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the

district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n,*

79 F.3d 1415, 1417 (5th Cir. 1996).

      DATED:  March 22, 2010.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE